**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| VIRGINIA POWERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 16 C 8136 |
| ) | |
| NANCY A. BERRYHILL, Acting ) | Judge Rebecca R. Pallmeyer |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

<u>**MEMORANDUM OPINION AND ORDERD**</u>

Plaintiff Virginia Ann Powers, born November 16, 1953, claims she has been disabled within the meaning of the Social Security Act since November 16, 2008, her fifty-fifth birthday.[1] Plaintiff did not graduate from high school and, though once employed as a housekeeper, has not worked since 2006. (R. at 113-20, 158.) On October 1, 2012, Plaintiff applied for disability benefits, citing a history of a host of ailments: persistent back pain, arthritis, body pain, neuropathy, hypertension, gastroesophageal reflux disease, stomach and digestive problems, fibromyalgia, and high cholesterol. (R. at 158.) The Social Security Administration denied Plaintiff's application in February 2013 and, again, after reconsideration, in June 2013. (R. at 171, 175.) In August 2013, Plaintiff requested a hearing before an Administrative Law Judge and retained counsel. (R. at 179-80, 198.) Following the October 28, 2014 hearing, the ALJ concluded in a written decision that Plaintiff was not disabled between November 16, 2008 and September 30, 2010 (the "insured period")[2] because she retained the residual functional capacity

---

[1] Plaintiff initially claimed disability beginning January 1, 2007, but for reasons not clear from the record, at the hearing she requested to amend her onset date to November 16, 2008. (R. at 112.)

[2] The parties do not dispute that September 30, 2010 was Plaintiff's last date insured, and thus the last date for which she is eligible to receive Social Security disability benefits. (R. at 95); *see also generally* 20 C.F.R. §§ 404.110-404.115, 404.130-404.133 (describing how the Social Security Administration determines whether a given claimant is insured).

to perform light work as a "housekeeping cleaner."[3]  (R. at 96, 101.)  On June 14, 2016, the Social Security Appeals Council denied Plaintiff's request for review of the ALJ's decision (R. at 1), and on August 16, 2016, Plaintiff filed this action to challenge that decision.  For the reasons explained here, the court finds the ALJ's explanation inadequate to support his conclusions, and remands the case pursuant to Sentence Four of 42 U.S.C. § 405(g).

## FACTS

### A.    Medical History

As reflected in the medical records, for more than a decade, doctors have treated Plaintiff for chronic and acute pain throughout her body, along with various digestive problems.  She has also received some mental health treatment.  The court reviews Plaintiff's medical history below, first describing her history of body pain, and then turning to her digestive and mental health issues.

### 1.    Chronic Pain

Plaintiff testified at the hearing that she has suffered pain for a "long time," but it was tolerable until 2006 when she stopped working.  (R. at 128.)  She feels the most pain in her back and chest (R. at 123-25, 148), but also described pain in her legs and arms.  (R. at 122.)  Plaintiff characterized her pain during the insured period as "stabbing" and "burning."  On a one-to-ten scale, Plaintiff testified that her pain was at eight for "90 percent of the time."  (R. at 130.)

### a.    Dr. Parveen Varma

In 2004, Plaintiff began visiting the Grundy County Pain Center where she was treated by Dr. Parveen K. Varma.  (R. at 980.)  Dr. Varma noted that Plaintiff had "seen a number of physicians in the last 6-7 years before coming here," and that Plaintiff "stated that pain continues to bother her and she is having difficulty in performing her daily activities and also to sleep at nights."  Dr. Varma's earliest medical report in the record, dated August 3, 2004, reflects that at that time Plaintiff was suffering from upper back pain and left rib cage pain and wearing a "rib

---

[3]    As defined in Dictionary of Occupational Titles 323.687-014.

cage belt" that was "helping her." (R. at 984.) Dr. Varma readjusted Plaintiff's rib cage belt and ordered a bone scan. (R. at 988.) The bone scan showed normal results (R. at 988), and Dr. Varma diagnosed Plaintiff with costochondritis.[4] (R. at 981.) Dr. Varma also completed a Certificate of Medical Necessity for Plaintiff to be treated with a Transcutaneous Electrical Nerve Stimulator ("TENS") machine. (R. at 986.) In so doing, Dr. Varma certified that Plaintiff had had "chronic, intractable pain" for a period of 84 months, and that there was "documentation in the medical record of multiple medications and/or other therapies that have been tried and failed." (R. at 986.)

From August 23, 2004 until September 2, 2004, Plaintiff's ribs were treated with a Dynatron STS Machine.[5] (R. at 983.) Plaintiff told Dr. Varma that this treatment decreased the overall pain in her left chest wall to a three out of ten, but Dr. Varma's notes show that an "[e]xamination of chest wall revealed tenderness still present." (R. at 985.) Dr. Varma also conducted examinations of Plaintiff's right knee and right hip joint, determining that the right hip pain was "possibly due to soft tissue versus joint degeneration," while the right knee pain was "possibly due to degeneration versus soft tissue." (R. at 985.) After eight treatments with the STS Machine between August and September, however, Plaintiff's insurance carrier put a stop to the treatment. (R. at 980.) Dr. Varna wrote that he was "very much concerned that if we do not continue with treatment then she may relapse back and once again pain may go back to 8 out of 10." (R. at 980.) The record is silent as to whether Plaintiff continued treatment in the pain center after this point. During the hearing, the Plaintiff recalled that a "pain specialist in Morris"

---

[4]    Costochondritis refers to inflammation that causes localized chest pain on the ribcage. WEBMD, *Costochondritis* (last visited Nov. 19, 2018, 6:20 PM), https://www.webmd.com/pain-management/costochondritis#1.

[5]    An STS Machine is a device that delivers electrical current by way of peripheral nerves accessed through the legs, feet, hands, and arms. PATIENTSLIKEME, *What is STS Dynatron Machine* (last visited Nov. 20, 2018, 8:34 AM), https://www.patientslikeme.com/treatment/3252-sts-dynatron-machine-side-effects-and-efficacy.

ran a test involving bending, from which the specialist diagnosed Plaintiff with fibromyalgia[6] (R. at 128), but there is no report reflecting this diagnosis in the record.

### b.    Dr. Thomas O'Connor

Plaintiff also has received treatment from Dr. Thomas O'Connor, a gastroenterologist, since 2004, mostly for digestive issues but also for pain management.  On September 29, 2004, Plaintiff told Dr. O'Connor that she had "difficulty with chronic pain involving her knees and ankles," but had experienced "much benefit from the [Dynatron] STS system."  (R. at 381.)  Dr. O'Connor noted that Plaintiff "benefited greatly from this machine to control her chronic pain," and that it effectively eliminated her need for pain medication.  (R. at 381.)  By July 5, 2004, however, Dr. O'Connor recorded that Plaintiff "has had difficulty with leg pain related to her neuropathy." (R. at 380.)  And two visits later, on March 28, 2006, Plaintiff reported "epigastric discomfort radiating to the chest," noting that "exertions make it worse."  (R. at 378.)  Plaintiff continued seeing Dr. O'Connor regularly for her digestive issues, as described below, but the next reference to pain management in his records appears on November 4, 2011, when Dr. O'Connor noted that Plaintiff was "contemplating further evaluation for chronic back pain."  (R. at 366.)  As of February 2015, Plaintiff had had a spinal cord stimulator[7] inserted which reduced her pain from eight to four on a one-to-ten scale.[8]  (R. at 659.)

---

[6]    Plaintiff may have been referring to the Grundy County Pain Center, 425 US-6, Morris, IL 6045, GOOGLE MAPS, https://goo.gl/maps/iAwBbJERcuk (last visited Nov. 24, 2018).

[7]    A Spinal Cord Simulator is a small device that can be implanted under one's skin, which delivers electric pulses to mask spinal pain.  Mayfield Clinic, *Spinal Cord Stimulation* 1 (November 2018), https://d3djccaurgtij4.cloudfront.net/pe-spinal-cord-stimulation.pdf. The record indicates that Plaintiff did not decide to have a Spinal Cord Stimulator installed until 2013.  (R. at 804.)

[8]    Plaintiff later testified that this was inserted after the insured period.  (R. at 131.)

### c.    Dr. Bakul Pandya

Plaintiff saw Dr. Bakul Pandya, a neurologist, from 2004 through at least 2011, but the records for that treatment are not enlightening.  (R. at 125-26, 500, 996.)  The record includes results of a significant number of imaging examinations ordered by Dr. Pandya, but very few reports of Plaintiff's visits to Dr. Pandya prior to 2007.  The record also includes 22 pages of handwritten progress notes of visits between February 2007 and October 2010.  (R. at 337-358.) Plaintiff alleges that these notes broadly evidence "frequent treatment for neck pain, back pain, and paresthesias, as well as digestive problems" during the period (Plaintiff Motion for SJ [15] at 5), but the notes themselves are illegible. [9]

According to Dr. Pandya's earliest medical report, dated November 6, 2004,[10] Plaintiff told Dr. Pandya that she was suffering from headaches and dizziness, and Dr. Pandya ordered an EEG that showed normal results.  (R. at 996.)  At the hearing, Plaintiff recalled that around this time Dr. Pandya prescribed a medication, Gabapentin, but it did "not take the pain away" in her back, arms, or legs (R. at 12-24), and that Dr. Pandya decided not to prescribe any other pain medicine due to Plaintiff's stomach issues and numerous allergies, including to Morphine.  (R. at 129-31.)

Dr. Pandya's next medical reports in the record reflect that in February 2005, following Plaintiff's reports of paresthesias in hands and legs and neck and back pain, Dr. Pandya ordered a whole-body bone scan, MRIs of the thoracic and lower spine, an EMG, and an "NCV."[11]  (R. at 995, 1000-02.)  The bone scan revealed "degenerative and arthritic process in the extremities."

---

[9]       It appears that Dr. Pandya also treated Plaintiff for heart and arterial issues (*see* R. at 1081-89), but those issues appear to be unrelated to Plaintiff's chronic back and body pain, and neither party has cited to those records in their briefs.

[10]      The records refer to this as a return visit, suggesting Plaintiff had seen Dr. Pandya at least once before November 2004.

[11]      "NCV" is short for a "nerve conduction velocity" test, which "measures how fast an electrical impulse moves through [one's] nerve."  JOHNS HOPKINS MEDICINE, *Nerve Conduction Studies* (last visited Dec. 13, 2018, 1:47PM).  NCVs are used to identify nerve damage.  *Id.*

(R. at 1000.)  The MRIs revealed "[m]ulti-level degenerative bulging with mild foraminal stenosis at L4-L5" and "[m]inor thoracic spondylosis without evidence for a disc herniation or central or foraminal stenosis."  (R. at 1001-02.)  The EMG was "mildly abnormal" and showed "mild early peripheral neuropathy involving both legs."  (R. at 995.)  And the NCV showed only normal results.  (R. at 995.)  Several months later, in July 2005, Dr. Pandya ordered MRIs of Plaintiff's left and right shoulder.  (R. at 997-98.)  The examinations revealed "minimal arthritic findings" in the right shoulder, and "arthritic change evident" in the left shoulder.  (R. at 999.)  The next year, in March 2006, Dr. Pandya again ordered an EMG and an NCV.  (R. at 1005.)  The NCV again showed normal findings, but the EMG showed "[m]ild early bilateral carpal tunnel syndrome."  (R. at 1006.)  More than a year later, in May 2007, Plaintiff again complained to Dr. Pandya of "neck pain and paresthesias in the right hand and low back pain,"  (R. at 331.)  Dr. Pandya ordered another EMG from which he diagnosed plaintiff as suffering from "[m]ild right carpal tunnel syndrome," and mild to moderate chronic radiculopathy in the L5-S1 disc of the lumbar spine.  (R. at 332.)

The record does not contain another imaging report until November 2009, when Plaintiff again saw Dr. Pandya, describing "increasing pain in the neck . . . paresthesias in the right arm[, and] lower back pain."  (R. at 329.)  Dr. Pandya conducted yet another EMG, which yet again showed "[m]ild early right carpal tunnel syndrome" and this time located radiculopathy at the L4-5 disc of the lumbar spine.  (R. at 329.)  Later that year, Dr. Pandya ordered another set of MRIs of Plaintiff's lumbar and cervical spine.  (R. at 1090-92.)  These scans revealed "[m]ild spinal stenosis at C6-C7," "[m]ild neural foraminal stenosis," "disc protrusion at L2-L3," and "[d]evelopment of increased T2 signal involving the left posterior elements of L5 and S1" which the imager indicated was "most likely a stress response."  (R. at 1090-92.)  In February 2011, Dr. Pandya ordered an MRI of Plaintiff's right shoulder.  (R. at 500.)  This time, the results showed

severe osteoarthrosis, severe tendinosis,[12] edema at the acromioclavicular joint,[13] and some minimal cyst formation in the posterolateral aspect of the humeral head.[14]  (R. at 500.)  A subsequent MRI of Plaintiff's lumbar spine on August 19, 2011 revealed mild lateral curvature of the spine, as well as disc desiccation and stenosis across six vertebrae.  (R. at 498.)  And a follow-up EMG on August 22, 2011 yielded "abnormal" results, showing "[m]ild peripheral neuropathy" and "L 4-5 radiculopathy."  (R. at 505.)

At the hearing, Plaintiff recalled Dr. Pandya stating that she could consider surgery for her back, but that he did not recommend it.[15]  (R. at 129-30.)  Plaintiff said she never consulted a surgeon because she was afraid of potential complications, although she recalls Dr. Pandya mentioning in 2013 that she may want to reconsider surgery.  (R. at 129, 149-51.)  At the hearing, Plaintiff did not clarify precisely what kind of surgery she was referring to, and the court has found no evidence in the record explaining this.

### d.    Dr. Donald E. Roland

In January 2007, a Dr. Donald E. Roland (otherwise unmentioned in the record) ordered another set of MRI spinal scans for Plaintiff.  (R. at 1007.)  The MRI of the lumbar spine showed disc degeneration and disc desiccation across four discs: L2-L3, L3-L4, L4-L5, and L5-S1.  (R. at 1007.)  The examiner also observed "[n]arrowing of the spinal canal, primarily at L4-L5 and L2-

---

[12]    Tendinosis is a condition whereby tendons degenerate, causing pain and a loss of flexibility in the joint.  Amy Smith, MEDICALNEWSTODAY *What is tendinosis?* (Jan. 9, 2018), https://www.medicalnewstoday.com/articles/320558.php.

[13]    The acromioclavicular joint is the joint in the shoulder where the collarbone meets the shoulder blade.  JOHNS HOPKINS MEDICINE, *Acrimioclavicular (AC) Joint Problems* (last visited Nov. 19, 2018, 5:20 PM),
https://www.hopkinsmedicine.org/healthlibrary/conditions/orthopaedic_disorders/acromio clavicular_ac_joint_problems_22,AcromioclavicularJointProblems.

[14]    The "humeral head" is located on the upper arm.  INNERBODY, *Humerus* (last visited Nov. 19, 2018, 5:31 PM), http://www.innerbody.com/image_skelfov/skel19_new.html.

[15]    Plaintiff did not explain what kind of surgery she was referring to, and the court has found no evidence in the record clarifying this ambiguity.

L3." (R. at 1007.)  The MRI of the thoracic spine revealed "[d]isc degeneration and partial fusion at T4-5." (R. at 1009.)

### e.    Dr. Sumin Shah

Beginning on December 19, 2007, Plaintiff saw Dr. Sumin Shah, an osteopath, initially for neck pain and swelling. (R. at 406-10.)  Dr. Shah prescribed a two-week course of Bactrim,[16] and records from another visit two weeks later reflect "neck pain and swelling substantially improved . . . but still with mild symptoms." (R. at 406-10.)  The next month, on February 12, 2008, Dr. Shah recorded that Plaintiff "[s]till has neck pain . . . I believe there is a muscular component to this along sternocleidomastoid and [right] cervical paraspinals." [17] (R. at 404.)  Lingering neck pain is reflected in notes from a subsequent visit to Dr. Sumin Shah in August 2008. (R. at 397.)  Additionally, records from February and March 2009 show Plaintiff was experiencing "increasing abdominal pain" (R. at 385, 389), and on May 1, 2009, Plaintiff reported chest pain. (R. at 382.)  During this period, Dr. Sumin Shah's visit summaries consistently included the following language: "She does not have any neurological problems or symptoms." (R. at 386, 389, 392, 395, 398, 401, 404.)

### f.    Dr. Vijay Haryani

On March 4, 2009, Plaintiff saw Dr. Vijay Haryani, a cardiologist, complaining of "abdominal discomfort causing pressure up into the chest." (R. at 323.)  Dr. Haryani performed a physical examination of Plaintiff's blood pressure, pulse, respiration, neck, thyroid, lung fields, heart rate and rhythm, and abdomen. (R. at 324.)  Dr. Haryani's medical report lists fibromyalgia, degenerative joint disease, and hypertension under both the "medical history" and "diagnosis"

---

[16]    Bactrim is an antibiotic used to treat a wide variety of bacterial infections. WEBMD, *Bactrim DS* (last visited Nov. 19, 2018, 6:09 PM), https://www.webmd.com/drugs/2/drug-5530/bactrim-ds-oral/details.

[17]    The sternocleidomastoid (or "SCM") muscle "is located at the base of your skull on either side of your neck, behind your ears." HEALTHLINE, *SCM Pain and What You Can Do* (last visited Dec. 13, 2018, 10:07AM), https://www.healthline.com/health/sternocleidomastoid-pain.

headings.  (R. at 324.)  The report also lists peripheral neuropathy as part of Plaintiff's "medical history," and hyperlipidemia as an additional diagnosis.  (R. at 324.)  The next day, on March 5, 2009, Dr. Haryani ordered an EKG on Plaintiff, from which he concluded she had "[m]oderately impaired exercise tolerance," but noted the absence of chest pain during the procedure.  (R. at 325.)

### g.    Dr. Ikenna Okpareke

In October 2013, several months after she filed an application for disability benefits, Plaintiff began seeing Dr. Ikenna Okpareke, whom Plaintiff describes as a "pain specialist."  (R. at 776); (Plaintiff Motion for SJ [10] at 5.)  In 2014, Dr. Okpareke completed a "Pain Report"[18] in which she wrote that Plaintiff "experience[s] or complain[s] of pain" in her mid-back and left chest wall.  (R. 776.)  Significantly, Dr. Okpareke concluded that Plaintiff's complaints of pain are "within the range that is reasonably related to . . . costochondritis and thoracic [degenerative disc disease]"[19]  and that "[o]n the basis of clinical observations and diagnostic impressions," Plaintiff experiences chronic and acute pain in her mid-back and chest wall with ambulation, not relieved by medication or heat.  (R. at 776-77.)  Dr. Okpareke additionally marked boxes confirming that Plaintiff's pain "markedly impact[s] upon the ability to sustain concentration and attention, resulting in frequent failure to complete tasks," that Plaintiff is not "able to function in a competitive work setting . . . on an eight hour per day, five days per week basis," and that "the level of pain suffered by [Plaintiff] is likely to increase if [she] returns to work."  (R. at 777.)

---

[18]    The court notes that this report was prepared and provided by Plaintiff's counsel, after Plaintiff made her initial claim for Social Security benefits.

[19]    Diagnoses for both of these conditions are reflected in MRIs discussed above.

### h. Dr. Yatin Shah

Before, throughout, and following the insured period, Plaintiff also sought treatment from Dr. Yatin Shah and nurse practitioners under Dr. Yatin Shah's supervision.[20] The records from Dr. Yatin Shah's office resist concise summary. On various occasions between 2007 and the end of the insured period, Plaintiff reported, *inter alia*, pelvic pain (R. at 758), chest pain (R. at 758, 755, 745), stomach/abdominal pain (R. at 738, 755, 757, 760), and sinus pain (R. at 737, 750, 752.) During this period, Plaintiff was diagnosed with, *inter alia*, hypertension (R. at 760), hyperlipidemia (R. at 747, 760), sinusitis (R. at 754), allergic rhinitis (R. at 751), and pancreatitis (R. at 741.) By the end of the insured period, in March 2010, Plaintiff had prescriptions for 11 different medications.[21] (R. at 749.)

In the years following the insured period, Plaintiff would also report aching pain (R. at 711, 717, 722), deep pain (R. at 711, 717, 722), neck pain (R. at 712, 718), back pain (R. at 712), a "burning sensation" (R. at 722), fatigue (R. at 711, 717, 722), weakness (R. at 722), muscle stiffness (R. at 711, 717), and numbness. (R. at 711.) Medical reports also reflect diagnoses for neuropathy (R. at 714, 719, 729), esophageal reflux (R. at 720, 724, 729), sleep apnea (R. at 714, 720, 725, 729), fibromyalgia (R. at 714, 720, 725, 822, 832, 906, 913), chronic airway obstruction (R. at 714, 720, 725), and hearing loss. (R. at 714.)

On February 25, 2014, Dr. Yatin Shah completed a Fibromyalgia Residual Functional Questionnaire in which he attested that Plaintiff "meet[s] the American Rheumatological Society's criteria for Fibromyalgia." (R. at 704.) Dr. Yatin Shah checked boxes indicating that Plaintiff experiences pain in her lumbosacral spine, cervical spine, thoracic spine, chest, shoulders, hips, legs, knees/ankles/feet, and left arm. (R. at 704.) He further identified several factors that

---

[20] It bears note that Dr. Yatin Shah did not co-sign all the reports provided by his office, and some reports were only co-signed several years after the examination took place.

[21] These medications were: Niaspin, Benicar, Simvastatin, Cardizem LA, Neurotim, Fish Oil, Epipen, Ultrase Capsule EC, BL Aspirin, Afrin Nasal Spray, and Pantoprazole ZOD.

precipitate Plaintiff's pain, including changes in weather, movement, stress, heat, static position, fatigue, cold, humidity, and allergy.  (R. at 704.)  Significantly, Dr. Yatin Shah affirmed that "based upon [his] examinations, subjective and objective findings . . . [Plaintiff's] descriptions of fatigue and pain [are] credible."  (R. at 704.)

Later in the questionnaire, Dr. Yatin Shah responded to prompts gauging Plaintiff's capability to work.  He affirmed that Plaintiff's concentration and attention are frequently impacted by fatigue and pain, and that Plaintiff experiences a "[s]evere limitation" in her "ability to deal with work stress."  (R. at 705.)  He wrote that Plaintiff does not "retain the functional ability to work in a competitive environment, in even a sedentary occupation, on a full-time, 8 hours a day, 5 days a week basis . . . due to [low] attention and mobility," attesting that Plaintiff would "need to lie down at unpredictable intervals during a work shift," and that her impairments would cause her to be absent from work more than three times per month.  (R. at 705.)

### 2.    Digestive Issues

In addition to pain, Plaintiff claims digestive problems interfered with her ability to work.  (R. at 136.)   Because digestive difficulties are not a focus of Plaintiff's appeal, the court summarizes the evidence on these issues more briefly.  Plaintiff recalled experiencing diarrhea so severe that she "couldn't eat when [she] wanted to," and that she would frequently have "accidents."  (R. at 136.)  Although Plaintiff was never hospitalized for any of her digestive problems (R. at 139), she was treated for this condition by Dr. O'Connor, who saw her every three to six months during the insured period.  (R. at 135, 366-81.)

The medical records show that between 2008 and 2010, Plaintiff experienced pancreatic insufficiency, a parotid gland infection, a neuroendocrine tumor of the pancreas, nausea, and chronic gastritis.  (R. at 368-73.)  In June 2009, Plaintiff experienced "some upper abdominal discomfort but she . . . declined pain clinic evaluation [and] she report[ed] her symptoms [were] manageable."  (R. at 371.)  Later that year, in December 2009, Plaintiff reported "doing relatively well."  (R. at 370.)  In September 2010, Dr. O'Connor wrote, "[Plaintiff] has been doing well. . . .

She has had no change in abdominal discomfort. [Plaintiff] reports her appetite has been poor and that she no longer has a regular appetite and she will have some low-grade nausea." (R. 369.)

Since 2011, Plaintiff's condition seems to have improved significantly. In May 2011, she reported "she ha[d] been doing very well . . . , her stomach has felt much better . . . , she denie[d] any difficulty tolerating her diet [and] her weight [had] increased." (R. at 367.) In November 2011, similarly, Dr. O'Connor wrote, "She has been feeling better. She reports that Carafate[22] helps her stomach substantially. She notes that she will occasionally have episodes of nausea but these have been less frequent since she has been on this medication." (R. at 366.)

### 3. Anxiety and Depression

Plaintiff testified that she was "emotionally . . . having a hard time" during the insured period, but was "trying to get through things without being crutched with antidepressant drugs." (R. at 140, 147.) She testified that, between 2008 and 2009, she was treated "[o]ff and on" for depression. (R. at 140.) She explained that "Dr. Shah"[23] would give her Zoloft "at times," although she was not sure that this was a depression medication. (R. at 140.) She also recalled that a nurse would call her once a month to "help give [her] motivation." (R. at 147.) Plaintiff characterized her depression as linked to physical pain, in that worsening pain exacerbated her feelings of depression. (R. at 151.)

There is some objective medical evidence supporting Plaintiff's testimony. Plaintiff wrote in a report to the Social Security Administration that during an August 15, 2013 visit to Dr. Surendra Gulati, a neurologist, Dr. Gulati recommended Plaintiff see a psychiatrist. (R. at 296.)

---

[22]     Carafate is a medication used to treat and prevent ulcers in the intestines. WEBMD, *Carafate* (last accessed Nov. 20, 2018 11:23 AM), Costochondritis refers to inflammation that causes localized chest pain on the ribcage. WEBMD, *Costochondritis* (last visited Nov. 19, 2018, 6:20 PM), https://www.webmd.com/pain-management/costochondritis#1.

[23]     Plaintiff did not clarify whether she was referring to Dr. Sumin Shah, an osteopath, or Dr. Yatin Shah. Since she referred to her "primary doctor," the court assumes she meant Dr. Yatin Shah.

In February 2014, a nurse practitioner working with Dr. Yatin Shah diagnosed Plaintiff as suffering from anxiety and depression. (R. at 714.) And in response to the 2014 Fibromyalgia Residual Functional Questionnaire, Dr. Yatin Shah noted that Plaintiff suffers from depression and/or anxiety. (R. at 705.)

No medical professional appears to have diagnosed Plaintiff as suffering from a mental disorder during or prior to the insured period, however. On March 29, 2007, Dr. Carolyn Lecour wrote that Plaintiff was "Negative for anxiety" and elaborated, "She does not have depression or suicidal thoughts." (R. at 740.) Dr. Lecour reiterated this finding verbatim on May 23, 2007. (R. at 737.) On July 10, 2009, Victoria Mancke, a nurse practitioner, wrote that Plaintiff presented "[n]o psychomotor mood, affect, speech, or thought impairments." (R. at 758, 760.) Ms. Mancke reiterated this finding verbatim following visits on August 10, 2009, October 14, 2009, March 2, 2010, May 7, 2012, and October 17, 2012. (R. at 742, 744. 745, 747, 749, 751-52, 754, 755, 757.)[24] It appears, however, that Plaintiff may have been treated for anxiety and depression during this insured period. Notes from a February 3, 2009 visit to Dr. Shah indicate plaintiff had once taken the "lowest dose of Zoloft," and intended to try it again (R. at 388-89), but a March 4, 2009 report by Dr. Vijay Haryani, a cardiologist, did not list Zoloft as among plaintiff's current medications. (R. at 323-24.)

## B.    Plaintiff's Testimony

### 1.    Work History

During the hearing, Plaintiff testified that she had once been a housekeeper at Embassy Care Center, a nursing home. (R. at 114.) The job required her to frequently lift 50-100 pound "isolation bags" to carry them out of the care facility. (R. at 115.) Plaintiff said she was ultimately fired from Embassy Care because she "couldn't meet their hours." (R. at 116.)

---

[24]    The July and October 2009 reports were co-signed by Dr. Stephen Wadowski. (R. at 760). The 2012 reports were co-signed by Dr. Yatin Shah. (R. at 744, 748.)

Shortly thereafter, Plaintiff took a job as a care giver at Quality Home Health, which Plaintiff describes as a "unit that took care of . . . disabled people [and] homebound people." (R. at 117-18.) She testified that she typically worked fewer than 40 hours per week there, because she was not educationally qualified to do much of the work available.[25] (R. at 118-19.) At some point (unidentified in the record), Plaintiff stopped working at Quality Home Health because she "couldn't deal with [her] pain," which she felt in her chest, back, legs, feet, and arms. (R. at 119.)

Plaintiff's most recent job was as a cleaner at Mainstreet Movies from 2005 to 2006. (R. at 119-20.) She testified that this job offered flexible hours, which better accommodated her chronic pain. (R. at 121.) Asked why that job ended, Plaintiff testified that she could no longer keep up with even a relaxed pace of work, and that her pain was "just too unbearable." (R. at 122.) She has not held a job since then. (R. at 113.)

## 2. Day-to-Day Activity

Plaintiff testified that during the insured period she was able to lift up to 20 pounds, but doing so would cause pain that would linger through the following day. (R. at 152.) She recalled that she could stand for no longer than 10-15 minutes, after which point she would need to either sit down or lean on something. (R. at 152.) Plaintiff also told the ALJ that she could walk unaided for up to half a block, but was unable to stand or walk for most of the day as she had done in her prior jobs. (R. 152-53.)

Plaintiff testified that her capability to do basic housework during the insured period was very limited. She said that she was able to mop floors, but "not as often as [she] wanted to," and that she could not stand up long enough to cook a meal. (R. at 140.) She could do her own laundry and heat up meals that her daughter or one of her grandchildren had prepared for her. (R. at

---

[25] Plaintiff left school before completing the ninth grade, and does not have a high school diploma, G.E.D. or equivalent. (R. at 113-14.)

141.)  She explained that her grandchildren visited "every other day," and that her predominant activity during this period was watching television.  (R. at 141, 144.)

Plaintiff occasionally visited her grandchildren, but would drive the half-block distance because she "couldn't go out and walk for any length of time."  (R. at 141-42.)  Every week or two, Plaintiff would also make a 20- to 30-minute drive to get groceries, and at the grocery store she would lean on a shopping cart as a walking aid.  (R. at 143, 152.)  Every week, Plaintiff would also attend a 45-minute church service, and often sang as part of the "praise team."  (R. at 144-45.)

Finally, Plaintiff testified that she vacationed with her husband in their "camper," parking it three miles away from home at a recreational center.  (R. at 146-47.)  Once there, Plaintiff typically stayed inside the camper, watching a movie or visiting with grandchildren, while her husband fished and prepared food.  (R. at 146.)  She testified that occasionally she would also cook food on a grill and watch a campfire.  (R. at 146.)

## C.    Vocational Expert Testimony

Ciara Diggins, a vocational expert, testified at the hearing.  The ALJ asked her to "identify past work that [Plaintiff] performed since September 30, 1995."  (R. at 153.)   Apart from introducing herself, VE Diggins' testimony was limited to a two-sentence description of Plaintiff's prior jobs as a housekeeping cleaner and home attendant in terms of the Department of Labor's *Dictionary of Occupational Titles* ("DOT").   Specifically, VE Diggins testified that the DOT classifies the work of a housekeeping cleaner as unskilled and light work, but Plaintiff's actual work responsibilities called for medium exertion; in contrast, her work as a home attendant is classified by DOT as semiskilled, and calling for medium exertion, but the work Plaintiff actually performed in that role was light work.[26]  The ALJ did not ask any other questions of VE Diggins.

---

[26]    Housekeeping cleaner is defined at DOT 323.687-014.  Home attendant is defined at DOT 354.377-014.

## DISCUSSION

**A.    Legal Framework**

The Social Security Act authorizes judicial review of final decisions of the Commissioner of Social Security. *See* 42 U.S.C. § 405(g). The "final decision" in this case was the ALJ's decision to deny benefits, as the Appeals Council denied Plaintiff's request for review. *See Thompson v. Berryhill*, 722 Fed. App'x. 573, 579 (7th Cir. 2018).

On appeal, this court considers whether the ALJ's findings were supported by "substantial evidence," 42 U.S.C. § 405(g), and whether the ALJ's decision is "the result of an error of law," *Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012) (quoting *Rice v. Barnhart*, 384 F.3d 362, 369 (7th Cir. 2004). "Substantial evidence" in this context means more than "a mere scintilla" of proof, such that "a reasonable mind might accept [it] as adequate to support [the ALJ's] conclusions." *Walker v. Berryhill*, 900 F.3d 479, 482 (7th Cir. 2018) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This court's role is not to "to displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). The court will, however, "conduct a critical review of the evidence, considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014) (quoting *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005)). This standard has frequently been articulated as requiring an ALJ to "at minimum . . . build an accurate and logical bridge from the evidence to her conclusion." *Spicher v. Berryhill*, 898 F.3d 754, 759 (7th Cir. 2018); *see also*, *e.g.*, *Steele v. Barnhart,* 290 F.3d 936, 941 (7th Cir. 2002); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

A person is "disabled" under the Social Security Act if he or she is unable to engage in "substantial gainful activity" due to a medically-determinable physical or mental impairment. 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" is construed broadly; a claimant is only

disabled if she is "not only unable to do [her] their previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* at § 423(d)(2)(A).

To determine whether a given claimant is disabled, the ALJ must follow the five-step sequential process described in 20 C.F.R. §§ 404.1520(4), 416.920. These regulations require the ALJ to examine (1) whether the claimant is or was engaged in substantial gainful activity during the relevant time period, (2) if not, whether she had a severe impairment (or a combination of severe impairments); (3) if so, whether she was automatically disabled because an impairment or combination of impairments is listed in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether she could perform her past work given her "residual functional capacity" ("RFC") which is based on all of her impairments (not just the severe ones); and (5) if not, whether she could do any other work given her RFC, age, education, and work experience. *Cerentano v. UMWA Health & Ret.* Funds, 735 F.3d 976, 980 (7th Cir. 2013) (citing 20 C.F.R. § 404.1520).

**B.      The ALJ's Decision**

On December 17, 2014, the ALJ issued his decision, concluding that Plaintiff was not disabled from January 1, 2007 through September 30, 2010. (R. at 90, 93.) In his ruling, the ALJ first found that Plaintiff met the insured status requirements through September 30, 2010, and that Plaintiff had not engaged in substantial gainful activity since November 16, 2008. (R. at 95.) Proceeding to step two, the ALJ determined that Plaintiff had two severe impairments: lumbar degenerative disc disease with radiculopathy and pancreatic impairments. (R. at 95.) The ALJ also noted several other conditions that he considered but ultimately found non-severe: hypertension, COPD, carpal tunnel syndrome, atherosclerosis, thyroid nodule, and obesity. With regard to hypertension and COPD, the ALJ wrote that both conditions "appear to be controlled with medication and there is no evidence of end organ damage." (R. at 95.) Regarding Plaintiff's carpal tunnel syndrome, the ALJ noted that it was untreated by medication, and that Plaintiff had testified it caused her the "least amount of pain." (R. at 95.) And with regard to all three ailments,

the ALJ stressed that Plaintiff "has not alleged any functional limitations related to them."  (R. at 95.)  Turning lastly to obesity, the ALJ found that there was "no evidence in the record that [Plaintiff's] obesity results in any functional limitations" and that it therefore "does not cause more than a minimal effect on the claimant's ability to perform work activity."  (R. at 95-96.)[27]

In step three, the ALJ determined, relying only on the opinions of the State Agency Medical consultants,[28] that Plaintiff "did not have any impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (R. at 95-96.)

At step four, the ALJ determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. 404.1567(b), rendering her capable of performing past relevant work as a housekeeper cleaner, and therefore not disabled as defined in the regulations, 20 C.F.R. 404.1520(f).  (R. at 96, 101.)  In reaching this conclusion, the ALJ conceded that Plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms," but ultimately determined that "[Plaintiff's] statements concerning the intensity, persistence and limiting effect of these symptoms are not entirely credible."  (R. at 97-101.)  The ALJ's ruling did not specifically consider Plaintiff's testimony as relevant to his RFC determination; instead, it appears that he found her subjective testimony to not be credible largely because it is inconsistent with his determination.

The ALJ divided his underlying RFC analysis into two categories: evidence regarding stomach and digestive issues, and evidence regarding chronic pain.  First addressing Plaintiff's stomach and digestive ailments, the ALJ summarized the reports of Dr. O'Connor and Dr. Yatin Shah from 2004 through 2014.  (R. at 97-98.)  Following this summary, the ALJ wrote, "It appears

---

[27]    The ALJ did not explain his basis for finding atherosclerosis and thyroid nodule to be nonsevere.

[28]    No citation is made in the ALJ's opinion, but the court assumes he was referencing the reports of Dr. Lenore Gonzalez (R. at 158-63), and Dr. Julio Pardo (R. at 165-70.)

that claimant has received appropriate care for her symptoms and they have been improved or resolved with medications." (R. at 99.)

Turning to Plaintiff's chronic pain, the ALJ began by summarizing the medical reports of Dr. Haryani, Dr. Pandya, Dr. O'Connor, and Dr. Yatin Shah, from 2009 through 2014. (R. at 99-101.) The ALJ then highlighted several facts from which he concluded that "[Plaintiff's] complaints have been improved with the measures she has used." Specifically, he noted (1) that Plaintiff was never hospitalized, (2) that Plaintiff never had surgery or received physical therapy, (3) that Plaintiff's dosage of Gabapentin was not increased during the insured period, (4) that several medical records reflect "normal strength and gait," (5) that after the insured period, Plaintiff had a spinal cord stimulator installed, (6) that a medical report from June 2014 indicated Plaintiff's "overall pain was stable and low," and (7) that Plaintiff testified to "some capacity for lifting at least 20 pounds."[29] (R. at 100-01.) The ALJ also noted several activities he determined were "inconsistent" with the "allegedly disabling nature of [Plaintiff's] complaints." (R. at 100.) These included Plaintiff's ability to drive, attend church, sing at church, visit with her family, watch television, and go "camping."[30] (R. at 100.)

Next, the ALJ addressed Dr. Yatin Shah's statements in the 2014 fibromyalgia questionnaire, in which Dr. Shah concluded, *inter alia*, that Plaintiff "would be unable to sustain work in a competitive work environment on a full-time basis" due in part to her fibromyalgia. (R. at 100.) The ALJ rejected Dr. Yatin's Shah's opinions

> as they are based on the [Plaintiff's] subjective complaints. Dr. Shah's treatment notes do not document the trigger points, stiffness, impaired concentration or other objective abnormalities that would give rise to a conclusion that she has fibromyalgia as a medically determinable impairment. Further, the clinical examinations were generally normal. Thus, his assessment of limitations and

---

[29] The court notes that Plaintiff actually testified that 20 pounds was what she could lift "at most," and that if she attempted to do so she would be in pain through the following day. (R. at 152.)

[30] As discussed above, "camping" in this context meant little more than sitting inside a recreational vehicle.

estimate of absences are in excess of what he observed at the time of the examinations.

(R. at 100-01.)  The ALJ then addressed Dr. Okpareke's 2014 pain report in which Dr. Okpareke observed that Plaintiff's pain "is not relieved by medication and presents a marked impact upon her ability to sustain concentration and attention resulting in frequent failure to complete tasks." (R. at 101.)  The ALJ wrote that he "accord[s] these opinions little weight, as they relate to a period following the date last insured.  Dr. Okpareke indicated that the onset of the treating relationship was October 1, 2013."  (R. at 101.)

Last, the ALJ briefly discussed reports prepared by Dr. Lenore Gonzalez and Dr. Julio Pardo, the State Agency Medical consultants who reviewed Plaintiff's record following her initial claim and request for reconsideration, respectively.  (R. at 101, 158, 165.)  Dr. Gonzalez and Dr. Pardo both found that Plaintiff's impairments were non-severe.  (R. at 101.)  Though they supported his conclusion, the ALJ wrote, "I accord these [consultants'] opinions little weight.  I have fully considered the claimant's allegations of pain and limitations."  (R. at 101.)

C.    **Analysis**

1.    **The ALJ's Analysis of Chronic Pain**

Plaintiff contends that the ALJ failed to adequately address her allegations of chronic pain at step two, step three, and step four of the sequential analysis.  (Pl. Br. at 8-9.)  Her argument draws on Social Security Ruling 12-2P ("Ruling 12-2p"), which offers guidance on how adjudicators should determine whether a person has a medically determinable impairment ("MDI") of fibromyalgia and, if so, whether that MDI determination warrants a finding of disability.  SSR 12-2p at *1-2.  Ruling 12-2p directs that at step two of the sequential analysis, an ALJ should find that fibromyalgia constitutes a severe impairment if "the person's pain or other symptoms cause a limitation or restriction that has more than a minimal effect on the ability to perform basic work activities."  SSR 12-2p at *5.  The ALJ's written decision makes no mention of this guidance, and does not list fibromyalgia as one of Plaintiff's severe impairments.  Indeed, despite addressing

eight other potential impairments in step two, the ALJ did not mention fibromyalgia once in that section.

The Government contends that this omission, even if not supported by substantial evidence, is immaterial. In the government's view, "an ALJ need not designate each of a claimant's impairments as 'severe' or 'non-severe'" because one severe impairment is enough to proceed to step three. (Defense Motion for SJ [15] at 4.) This court is less certain. The Seventh Circuit has noted in some cases that omissions in step two are immaterial. *See Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010); *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003). Implicit in these holdings is the suggestion that step three analysis incorporates ailments omitted from step two. In *Barnhart v. Thomas*, however, the Supreme Court held that in step three an ALJ may only consider those ailments which he or she previously found to be "severe" in step two. 540 U.S. 379-80 (2003) ("At step three, the agency determines whether *the impairment which enabled the claimant to survive step two* is on the list of impairments presumed severe enough to render one disabled" (emphasis added).). Thus, an unjustified omission in step two could undermine the listings analysis in step three. Several Seventh Circuit cases have adopted this requirement. *See, e.g.*, *Cerentano v. UMWA Health & Retirement Funds*, 735 F.3d 976, 980 (7th Cir. 2013) (noting that the third step asks whether claimant "is automatically disabled because his *severe impairment* is referenced in 20 C.F.R. § 404.1520(d)" (emphasis added)).

This apparent tension in the case law needs not be resolved in order to decide this case, however. Without ruling on whether the ALJ erred in step two or step three, the court concludes that the ALJ's RFC determination was not supported by substantial evidence. As explained below, the court concludes that the ALJ (1) ignored a significant amount of relevant evidence, (2) discounted the opinions of treating physicians without a sound reason for doing so, and (3) determined the Plaintiff's complaints of pain to be non-credible without first building a logical bridge to that conclusion.

### a.   Omissions in the Record

ALJs have "a duty to fully develop the record before drawing any conclusions." *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015).  As applied to disability claims involving fibromyalgia, Ruling 12-2p stresses the importance of "objective medical evidence," and provides that "[i]n cases involving [fibromyalgia], as in any case, we will make every reasonable effort to obtain all available, relevant evidence to ensure appropriate and thorough evaluation."  For example,

    a.    We may recontact the person's treating or other source(s) to see if the information we need is available;

    b.     We may request additional existing records;

    c.     We may ask the person or others for more information; or

    d.    If the evidence is still insufficient to determine whether the person has an MDI of FM or is disabled despite our efforts to obtain additional evidence, we may make a determination or decision based on the evidence we have.

SSR 12-2p.

This guidance is particularly important in cases of fibromyalgia because symptoms of fibromyalgia can fluctuate, such that a narrow record may not reveal the extent of a person's symptoms.  *Id*.  Ruling 12-2p thus counsels that the ALJ should "consider a longitudinal record whenever possible," and is expected to "make every reasonable effort to obtain available information that could help us assess the credibility of the person's statements."  *Id*.

The ALJ's efforts to compile and consider sufficient evidence do not meet this standard.  As the ALJ himself recognized, there is a notable disconnect between the medical reports listing fibromyalgia as a diagnosis and the absence of examination reports conclusively substantiating that diagnosis.  Notwithstanding several documented diagnoses for fibromyalgia, the ALJ found no treatment notes that "document the trigger points, stiffness, impaired concentration or other objective abnormalities that would give rise to a conclusion that she has fibromyalgia as a medically determinable impairment."  (R. at 106.)  The ALJ also stressed that "there are no objective clinical findings to suggest limitations in sitting, standing or walking during the time in

question." (R. at 107.) The ALJ concluded from this that such evidence does not exist; this may, of course, be true, but it is also possible that a fully developed record would fill these gaps.

Of greatest concern is the ALJ's failure to attempt to contact Dr. Pandya—the only neurologist who treated Plaintiff, who took contemporaneous handwritten notes documenting her condition throughout the insured period. These notes are largely illegible to the court, and the ALJ's reference to their comments in a single short sentence suggests that the ALJ, too, was confounded by their contents. Given the significance of Dr. Pandya's treatment, the court concludes the ALJ was required to do more. The ALJ expressed frustration during the hearing at what he viewed as contradictory advice Plaintiff reported receiving from Dr. Pandya (R. at 149-50), but made no apparent effort to resolve that confusion. Ruling 12-2p specifically contemplates that re-contacting a claimant's doctor is a "reasonable" effort an ALJ may make to clarify evidence, and the court concludes the ALJ should have done so with respect to Dr. Pandya. *See Richardson v. Berryhill*, No. 1:16-CV-00116-HBB, 2017 WL 1227941, at *5 (W.D. Ky. Mar. 31, 2017) (finding that where an ALJ was "unsatisfied" with a single diagnosis of fibromyalgia, "he should have conducted the additional steps set forth [in Ruling 12-2p]," including contacting the physician and requesting additional records).

Failure to contact the treating physician might not, on its own, require remand, but the court is troubled by the ALJ's failure to discuss other significant evidence at all. For instance, the opinion omits any reference to Dr. Sumin Shah, the osteopath who treated Plaintiff's recurring neck pain between 2007 and 2009. Dr. Sumin Shah's records show that Plaintiff's pain resisted attempts at treatment through medication, casting doubt on the notion that Plaintiff's pain was controlled during the insured period. These records also emphasize the lengths Plaintiff went to in search of treatment for pain during the insured period, further corroborating her testimony at the hearing.

Indeed, the opinion omits any reference whatsoever to Plaintiff's treatment history prior to 2009, as it related to her chronic pain.[31]  The ALJ thus made no reference to the imaging tests ordered by Dr. Pandya between 2004 and 2009 (R. at 331-32, 996-1006); to the MRI scans ordered by Dr. Roland (R. at 1007), to Dr. O'Connor's notes evidencing contemporaneous reports of pain in 2005 and 2006 (R. at 378-81), or to any of Plaintiff's treatment by the Grundy County Pain Center (R. at 980-88).  The ALJ did not explain his reasoning for omitting discussion of these records, and his decision conflicts with Ruling 12-2p's guidance to "consider a longitudinal record whenever possible."  The omission of the imaging tests ordered by Dr. Pandya is particularly troubling, as these contain diagnoses for neuropathy that later records do not independently substantiate.

### b.    The ALJ's Treatment of Expert Opinions

The Code of Federal Regulations instructs ALJs to consider six factors in evaluating what weight to assign to a medical opinion: (1) the doctor's examining history; (2) the doctor's treating relationship; (3) whether the opinion includes supporting evidence; (4) whether the opinion is consistent with other evidence in the record; (5) whether the doctor is a specialist; and (6) any other factor which "tend[s] to support or contradict" the opinion. 20 C.F.R. § 404.1527(c).  The opinion of a treating physician "regarding the nature and severity of a medical condition" is entitled to "controlling weight" unless the ALJ sets out "good reasons" for assigning it lesser weight.  *Id.* at § 404.1527(c)(2) [hereinafter "the treating-physician rule"];[32] *Walker v. Berryhill*, 900 F.3d 479, 485 (7th Cir. 2018).  The Seventh Circuit has found that two examples of "good reasons" are (i) a determination that an opinion is "based upon a claimant's subjective complaints rather than

---

[31]    The ALJ did discuss some earlier records, but only as they related to Plaintiff's digestive issues.  The court is unsure why Plaintiff's history of chronic pain warranted a different approach.

[32]    New regulations eliminated the treating physician rule last year, but the change is effective only for claims filed after March 27, 2017, and thus does not apply to this case.  *See* 20 C.F.R. § 404.1520c.

objective medical evidence," *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016), and (ii) a finding

that the opinion is "inconsistent with the record," *Rainey v. Berryhill*, 731 F. App'x 519, 523 (7th

Cir. 2018). In order to survive appellate review, these reasons must be "adequately articulate[d]"

such that the court "can follow [the ALJ's] reasoning," *Minnick v. Colvin*, 775 F.3d 929, 938 (7th

Cir. 2015), and the ALJ's evidence must be "persuasive," *Rainey*, 731 F. App'x at 523. In

instances where the opinion of a treating physician is not given controlling weight, 20 C.F.R.

§ 404.1527(c)(2) provides that an ALJ should determine what weight to give it by considering

factors (3) – (6), as well as two additional factors: (i) the length of the treatment relationship and

the frequency of examination, and (ii) the nature and extent of the treatment relationship. 20

C.F.R. §§ 404.1527(c)(i)-(ii).

Before turning to the ALJ's conclusions, it bears note that the Seventh Circuit does not

disfavor post-hoc medical opinions rendered after the time period at issue (such as, in this case,

the fibromyalgia diagnoses rendered by Dr. Yatin Shah and Dr. Okpareke in 2014). In *Allord v.

Barnhart*, the court noted that a retrospective diagnosis may be established so long as there is

contemporaneous corroboration. 455 F.3d 818, 822 (7th Cir. 2006) (citing *Wilder v. Apfel*, 153

F.3d 799, 802 (7th Cir. 1998). That corroboration need not be in the form of a medical opinion,

or even medical evidence of any kind. *Id*. That is, "[r]etrospective diagnosis of an impairment,

even if uncorroborated by contemporaneous medical records, but corroborated by lay evidence

relating back to the period of disability, can support a finding of past impairment." *Id*. (quoting

*Newell v. Commissioner of Social Security*, 347 F.3d 541, 547 (3d Cir. 2003)).

The ALJ declined to give Dr. Yatin Shah's 2014 fibromyalgia diagnosis controlling weight,

and this court has no quarrel with that assessment. Although Dr. Shah treated Plaintiff before,

during, and after the insured period, his responses to the fibromyalgia questionnaire leave open

the possibility that his diagnosis was based on "subjective complaints rather than objective

medical evidence," which under *Ghiselli* constitutes a "good reason" to deny his diagnosis

controlling weight. Dr. Shah did indicate generally that his diagnosis was based on "examinations"

and "objective findings," but it was not patently erroneous for the ALJ to weigh the absence of any clear accounting of those examinations and findings against this. Indeed, where Plaintiff's history of fibromyalgia is discussed in Dr. Shah's medical records, it is prefaced with the line, "The history is provided by patient." (R. at 711, 717, 722, 819, 903, 910.) Thus, the ALJ reasonably inferred that Plaintiff's own reports were the evidence on which Dr. Shah based his conclusions; this is a "good reason" to deny Dr. Shah's opinion controlling weight. *See Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016).

The ALJ further determined, however, that Dr. Yatin Shah's fibromyalgia diagnosis was not entitled to *any* weight, writing "I reject [Dr Shah's] opinions as they are based on the claimant's subjective complaints." (R. at 100.) The court cannot find a logical bridge to the determination that Dr. Shah's opinions should be altogether discounted. Although Dr. Shah is not a specialist, he has examined and treated Plaintiff for over a decade, often seeing her several times each year. And although the questionnaire was not filled out until 2014, its conclusions are corroborated by Plaintiff's contemporaneous complaints of pain, as well as Dr. Haryani's 2009 report listing fibromyalgia in Plaintiff's medical history.

The ALJ asserts that Dr. Shah's conclusions should nevertheless be ignored because they are inconsistent with his treatment notes, which, according to the ALJ, include clinical examinations that show "generally normal" results. In fact, they do not. To be sure, the five visits to which the ALJ directly cites did not yield reports reflecting that Plaintiff has fibromyalgia. But no fewer than seven others did. *See* (R. at 714, 720, 725, 822, 832, 906, 913.) It appears the ALJ selectively picked out reports where Plaintiff presented to Dr. Shah, her primary care physician, for non-neurological issues, including a UTI (R. at 736), stomach pains (R. at 741, 755), a sinus infection (R. at 749), and a follow-up on lab tests (R. at 758.) As the Seventh Circuit has noted, such "selective reading of . . . years of treatment notes is not persuasive." *Lanigan v. Berryhill*, 865 F.3d 558, 564 (7th Cir. 2017).

Dr. Shah's opinion on Plaintiff's fibromyalgia would of course be entitled to more weight were it accompanied by more extensive documentation of underlying medical tests. But under the treating physician rule, it was still entitled to *some* weight. By dismissing Dr. Shah's opinion outright "without relying on other medical evidence or authority in the record," the ALJ "substitut[ed] his own judgment for a physician's opinion." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000), as amended (Dec. 13, 2000). This was error.

The ALJ also chose to attach "little weight" to Dr. Okpareke's 2014 opinions about Plaintiff's pain. This, too, is not adequately explained. As a treating physician, Dr. Okpareke's opinion was entitled to controlling weight unless the ALJ articulated "good reasons" why it should be given less weight. The only reason the ALJ cited was that Dr. Okpareke's opinions related to a period following the date last insured. This determination is not supported by the case law, and also runs counter to common sense. Dr. Okpareke's opinions relate principally to the effects of ailments the Plaintiff was diagnosed with prior to and during the insured period. He writes, for instance, that Plaintiff's complaints of severe pain are "within the range that is reasonably related to" degenerative disc disease, an ailment that the ALJ himself concluded Plaintiff suffered from during the insured period. Dr. Okpareke's opinion on the debilitating impact of degenerative disc disease on the Plaintiff should have been given controlling weight, and the ALJ's failure to do so was error.

It bears note, moreover, that the ALJ's rationale for dismissing Okpareke's opinion is inconsistent with much of the ALJ's own opinion, which itself made extensive use of evidence that post-dates the insured period. For example, in discussing why he concluded Plaintiff's digestive problems were not debilitating, the ALJ discussed at length the treatments that improved Plaintiff's symptoms between 2013 and 2014. The ALJ also discussed a spinal cord stimulator that reduced Plaintiff's pain significantly, but which was not put in place until 2014. And although the ALJ wrote in step four that he accorded the 2013 opinions of state agency medical consultants "little weight," those very opinions were his sole basis for finding that Plaintiff's ailments did not

equal a listing in step three.  These inconsistencies prevent the court from following the sort of logical bridge necessary for meaningful appellate review, and undermine the ALJ's conclusion.

### c.  The ALJ's Credibility Determination

Plaintiff further challenges the ALJ's conclusion that her allegations of limitations caused by pain were "not fully credible."  (R. at 11.)  Here, too, the ALJ has failed to build a logical bridge from evidence in the record to his conclusion.  He writes, for example, that Plaintiff's ability to "drive, attend church services, sing and participate with the Praise Team at church and entertain her family" are "inconsistent with her allegedly disabling nature of her complaints."  But on their face, none of these activities are inconsistent with disability.  Rather, they are the sort of "activities of daily living" that the Seventh Circuit has repeatedly cautioned must not be conflated with work activities.  *See, e.g.*, *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) ("We have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time."); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer.")

Significantly, this case is not like *Molnar v. Astrue*, cited by the government, in which an ALJ "did not overstate [the claimant's] ability to perform daily activities," in the context of medically documented improvement in the claimant's condition.  395 F. App'x 282, 288 (7th Cir. 2010).  Here, the ALJ seems to have significantly overstated Plaintiff's ability to work.  For example, although the opinion mentions that Plaintiff enjoys "camping," the hearing transcript reveals that this activity involves little more than Plaintiff sitting in a recreational vehicle that her husband drives and parks at a local recreational center.  The opinion also notes that Plaintiff "admitted to some capacity for lifting at least 20 pounds with the documented spinal impairment," omitting that Plaintiff testified that were she to attempt to do so, she would be in pain for several hours as a

28

result; indeed, he expressly told Plaintiff that he was not asking her how much she could lift without pain. (R. at 152.) This focus on what Plaintiff can do in limited circumstance for a limited period of time disregards the very nature of fibromyalgia, the symptoms of which "can wax and wane so that a person may have 'bad days and good days.'" SSR 12-2p at 6. *See also Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014) (noting with regard to a Plaintiff who suffered sporadic migraines that "[a]bsent a showing that she has a completely flexible work schedule in her past position . . . the existence of symptom-free days adds nothing here.")

The ALJ also found that Plaintiff's "complaints have been improved with the measures she has used." The court does not see how. As mentioned above, two of the facts the ALJ cites in support of this claim were treatments that took place in 2013 and 2014, years after the end of the insured period. And while in some cases the absence of hospitalization, surgery, or physical therapy during the insured period could suggest an absence of need, the ALJ did little to discount alternate explanations, such as the possibility that Plaintiff simply did not have the resources to pay for physical therapy, or that Plaintiff is telling the truth when she claims that she was told by Dr. Pandya that surgery would not be helpful. The ALJ's rationale effectively creates a catch-22 in which Plaintiff's determination to try a number of different treatments—even after the insured period—is taken as proof that her pain was controlled, whereas evidence that she did not receive other treatments is construed as evidence that her pain was not severe. This is inconsistent with Ruling 12-2p.

The ALJ's conclusion that Plaintiff could "walk and/or stand for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and [sic] lift 10 pounds frequently and 20 pounds occasionally" is thus all but entirely unsupported by the record. Despite the length of the time and number of doctors' visits accounted for, not once did medical professional draw the same conclusion or express skepticism over the authenticity of Plaintiff's complaints of pain. Indeed, Dr. Shah submitted a document to the SSA in which he specifically affirmed that Plaintiff's reports of her symptoms were credible. Although ALJs are certainly "permitted to consider whether

[Plaintiff's] ability to perform daily activities are inconsistent with her alleged inability to work," *Molnar*, 395 F. App'x at 288 (citing SSR 96-8p), substantial evidence must support their findings, especially when those findings contradict sworn testimony the opinions of treating physicians. Here, no such support is evident in the ALJ's opinion.

### 2. The ALJ's Analysis of Plaintiff's Mental Health

Plaintiff also argues that the ALJ inadequately considered her alleged depression in analyzing her RFC. Under the regulations in force at the time, a mental impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms." 20 CFR § 404.1508. As the ALJ noted, although treatment records reflect Plaintiff received prescriptions for Zoloft, there is no evidence that Plaintiff was diagnosed with a mental illness, or presented with symptoms of mental illness, during or before the insured period. Plaintiff cites to 20 C.F.R. § 1512(e), which she contends creates a "duty to recontact Plaintiff's physicians to clarify the nature and extent of her mental impairments." (Plaintiff SJ Motion [10] at 9.) But unlike Ruling 12-2p, which governs analysis of Plaintiff's fibromyalgia, the version of § 1512(e) in force on the day of the ALJ's decision made no mention of a duty to recontact physicians. This court holds that there was no reversible error in the ALJ's treatment of Plaintiff's alleged depression.

### 3. The ALJ's failure to question a vocational expert

Separately, Plaintiff argues that the vocational expert's testimony was "inherently unreliable," and thus the ALJ committed error by relying on it to determine that the Plaintiff had the RFC to perform past work. This argument has no basis in law. Here, all that the VE testified to were the physical demands of Plaintiff's past work as a housekeeping cleaner and a caregiver, based on the *Dictionary of Occupational Titles*. Although there may be a colorable argument that this document is outdated as applied to some jobs, Plaintiff has not offered a basis for the conclusion that the physical demands of housekeeping or caregiving have changed significantly since publication.

**CONCLUSION**

For the reasons discussed herein, the ALJ's decision is reversed and remanded for further proceedings not inconsistent with this opinion. Plaintiff's motion for summary judgment [10] is granted; Defendant's motion for summary judgment [15] is denied. This case is terminated.

ENTER:

Dated: December 13, 2018

_____
REBECCA R. PALLMEYER
United States District Judge